

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

STATE OF MISSOURI,             )
                                             )

                    **Respondent,**   )

                                             )    **WD77379**

**v.**                                    )

                                           )    **OPINION FILED:**
                                           )    **December 15, 2015**

**BRYAN M. JOHNSON,**      )

                                           )

                    **Appellant.**   )

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Larry D. Harman, Judge**

**Before Division Three:** Joseph M. Ellis, Presiding Judge, and
Karen King Mitchell and Gary D. Witt, Judges

Bryan Johnson appeals his convictions, following a jury trial, for one count of first-degree statutory rape, § 566.032,[1] and one count of first-degree statutory sodomy, § 566.062, for which he was sentenced to consecutive terms of 12 years' imprisonment. In four points, Johnson argues that the trial court erred in both the admission of evidence and the denial of his motion for new trial based upon alleged juror misconduct. Finding no prejudicial error, we affirm.

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.

## Background[2]

In 2003, Johnson met Tami (Victim's mother) through the Pop Warner program in which Victim was a cheerleader. Johnson and Tami married in June 2004, when Victim was ten years old. At the time, Johnson had a twelve-year-old son, and Tami had another child—an eight-year-old son. Victim was very opposed to the marriage, and, the night before the wedding, she cried and asked Tami not to go through with it.

Though Johnson and Tami did not live together before the marriage, Johnson would occasionally spend the night at Tami's house while the children were also there. On nights when he was at the house, Johnson would go into Victim's room at bedtime and scratch her back. It began over the shirt but progressed to bare skin. As time went on, Johnson began touching Victim's bottom and private areas as well. This touching also progressed from over the clothing to underneath it, including insertion of his fingers into her vagina. Eventually, Johnson began putting his mouth on Victim's vagina, licking and sucking on it. Though the touching made Victim feel very awkward and uncomfortable, she did not tell anyone about it at the time because she was scared and did not understand what was happening.

After the marriage, when Johnson moved into the family home, the contact progressively worsened. Johnson began licking and sucking on Victim's breasts, placing his penis in between them and squeezing them together, and placing his penis inside of Victim's vagina and anus. Johnson also placed his penis near Victim's face and tried to put it in her mouth. The contact occurred approximately three times per week. In 2006 (when Victim was near the end of sixth grade), the contact stopped.

---

[2] Johnson does not challenge the sufficiency of the evidence to support his convictions. The facts are viewed in the light most favorable to the verdict. *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015).

During middle school and high school, Victim began to understand what had happened to her. In November 2011, the fall of Victim's senior year of high school, Victim went to Chicago with Johnson and two women to participate in a Pop Warner event. Tami was supposed to attend as well, but she got sick and was unable to go. The hotel room Victim shared with Johnson had two beds, but, during the night, Johnson attempted—on several occasions—to get into bed with Victim. Victim avoided contact by getting out of bed every time Johnson tried to get in with her. She did not tell the other women about Johnson's actions that night because they were his friends.

On January 30, 2012, after reconnecting with her biological father, Victim finally decided to reveal what Johnson had done to her between fourth and sixth grades. Victim texted her best friend and her best friend's mother, Dale Ann Durham, asking to come over to talk. When Victim got to Durham's house, Durham answered the door, and Victim fell into her arms sobbing. Victim sat on the couch for a long time, just crying, unable to articulate why. Victim finally asked for a piece of paper and a pen to write it down. When given the items, Victim wrote the word, "rape." Durham then contacted Victim's biological father and advised him as to what Victim had revealed.

Victim was given a Sexual Abuse Forensic Evaluation (SAFE) exam by a pediatrician at Children's Mercy Hospital. The exam revealed no scarring or tearing to Victim's genital or rectal areas, but this was not surprising, given both the amount of time that had passed and the fact that Victim had gone through puberty since the last contact.

Johnson was charged with one count of statutory rape and one count of statutory sodomy. At trial, Johnson testified in his own defense and denied all allegations. Johnson also presented several witnesses in his defense who testified to his good character and Victim's poor reputation

3

for truthfulness. The jury found Johnson guilty as charged. Following a sentencing hearing, the jury recommended that Johnson be sentenced to twelve years' imprisonment on each count.

While the jury was deliberating on Johnson's sentence, Johnson's stepdaughter, Tiffany Vogel, advised that she had seen a juror ("Juror") wink at Victim. Johnson's counsel indicated his concern that Juror perhaps knew Victim because both had graduated from the same high school and were close in age. The court allowed the parties to agree upon some questions to ask Juror, and after the jury had returned its sentencing verdict, the court put Juror on the stand for further voir dire:

> [The court]: There was a question as to whether or not you may have had some recognition or familiarity with one of the witnesses, and, so, [defense counsel] is just going to ask you a couple of questions you can just answer, okay?
>
> Juror: Okay.
>
> . . . .
>
> [Defense counsel]: Ms. [Juror], you had stated in voir dire, I think, that you didn't know [Victim] from high school, is that right?
>
> Juror: Uh-huh, correct.
>
> [Defense counsel]: After seeing her in court, did you recognize her as someone you knew?
>
> Juror: Uh, no, sir.

In his motion for new trial, Johnson argued that newly discovered evidence supported a finding that Juror engaged in misconduct by failing to reveal that she knew or recognized Victim. Specifically, Johnson argued that both Juror and Victim attended the same high school, were both involved in dance and cheer, appeared on the same page of the 2009 Kearney High School yearbook, and that Juror had to know Tami, who worked as the school's secretary at the time. The court held a hearing on Johnson's motion, wherein it received testimony from Juror, Juror's

4

mother, and a defense investigator. Juror again denied knowing or recognizing anyone involved in the case. She also denied ever telling her mother anything different. Juror's mother testified that Juror told her, after the trial, that she recognized "the girl" from high school, but did not know her. Juror's mother did not know what Juror meant by "the girl" or if "the girl" was Victim. The defense investigator testified that, when he attempted to serve a subpoena on Juror, he spoke with Juror's mother, who revealed that Juror said she recognized the parties involved after the case had begun.

After hearing argument, the court denied the motion for new trial and sentenced Johnson in accordance with the jury's recommendation, ordering the sentences to run consecutively. Johnson appeals.[3]

## Analysis

Johnson raises four points on appeal: (1) the trial court plainly erred and abused its discretion in overruling Johnson's request for a mistrial after the State's expert testified that Victim had been sexually abused; (2) the trial court abused its discretion in overruling Johnson's hearsay objection to a prosecution witness's testimony that Victim said she had been raped by her stepfather; (3) the trial court plainly erred in failing to either declare a mistrial or strike testimony elicited on cross-examination from two defense character witnesses, because their testimony was the result of improper cross-examination by the State; and (4) the trial court abused its discretion in overruling Johnson's motion for new trial on the basis of juror misconduct.

---

[3] Additional relevant facts will be recited in the discussion of Johnson's various points on appeal.

**A. The trial court committed no error regarding admission of Dr. Frazier's testimony.**

In his first point on appeal, Johnson argues that the trial court plainly erred and abused its discretion by overruling his request for a mistrial after Dr. Terra Frazier testified, on cross-examination, as follows:

> Q [Defense counsel]:  To a reasonable degree of scientific or medical certainty, can you state that [Victim] has had sexual intercourse?
>
> A. To a reasonable degree of medical certainty, my diagnosis would be child sexual abuse.

Following this testimony, defense counsel stated, "That wasn't my question."  Dr. Frazier asked counsel to repeat the question, at which point, defense counsel requested a sidebar.  At the sidebar, defense counsel objected to the testimony regarding child sexual abuse and asked the court to "either strike that, that testimony, or grant a mistrial at this point."  The court denied the request for a mistrial but granted counsel's request to strike on the basis that it was non-responsive.  The court then advised the jury:  "The jury should disregard the very last comment of the witness."  Counsel did not include his current claim of error in the motion for new trial.

"In jury-tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial . . . ."  Rule 29.11(d).[4]  "Claims that are not preserved may be reviewed in the discretion of th[e c]ourt for plain error."  *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015).  "Plain error is found when the alleged error facially establish[es] substantial grounds for believing a manifest injustice or miscarriage of justice occurred."  *Id*. (internal quotations omitted).  "Such errors must be 'evident, obvious, and clear.'"  *Id*. (quoting *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014)).

---

[4] All Rule references are to the Missouri Court Rules (2015), unless otherwise noted.

Here, we find no evident, obvious, or clear error in the court's ruling. First, contrary to Johnson's argument, Dr. Frazier's diagnosis of child sexual abuse did not amount to an improper expert witness comment on Victim's veracity as a witness insofar as Dr. Frazier never identified Johnson as the perpetrator of the abuse.[5] *See State v. Hendrix*, 883 S.W.2d 935, 940 (Mo. App. W.D. 1994) (finding no error in allowing SAFE examiner to testify that children were victims of sexual abuse, where testimony did not identify the defendant as the perpetrator); *State v. Mackey*, 822 S.W.2d 933, 937-38 (Mo. App. E.D. 1991) (finding no error in allowing two witnesses that had interviewed child victim to testify to their beliefs that the child suffered sexual abuse, where they did not identify the defendant as the perpetrator).

Second, Johnson has failed to demonstrate any prejudice from Dr. Frazier's testimony insofar as: (1) the court granted his request to strike the testimony; thus, it was no longer before the jury for its consideration; and (2) to the extent Dr. Frazier's testimony could be considered a comment on Victim's credibility, such an error was invited by Johnson.

Because "[w]e presume that a jury properly follows the instructions as given by the circuit court," *State v. Johnson*, 316 S.W.3d 491, 498 (Mo. App. W.D. 2010),

> [w]here improper evidence comes into a case but is promptly stricken by the court and the jury is instructed to disregard it, the reviewing court, in order to hold that the failure to grant a mistrial was reversible error, must determine and conclude as a matter of law from the entire record that the error was prejudicial and so impressive that its effect was not removed by the action of the trial court.

*State v. Dennison*, 428 S.W.2d 573, 577 (Mo. 1968).

Johnson argues that Dr. Frazier's stricken testimony prejudiced him because it was an improper comment on Victim's credibility that invested her allegations with a "scientific

---

[5] "'[E]xpert testimony that expresses an opinion with respect to the credibility or truthfulness of witnesses of the same type under consideration invests "scientific cachet" on the central issue of credibility,'" and therefore is improper. *State v. Foster*, 244 S.W.3d 800, 803 (Mo. App. S.D. 2008) (quoting *State v. Williams*, 858 S.W.2d 796, 800 (Mo. App. E.D. 1993)).

cachet." To the extent that Dr. Frazier's testimony could be viewed as a comment on Victim's credibility, it is only because that is how Johnson portrayed it. Johnson thoroughly cross-examined Dr. Frazier regarding how she reached her diagnosis and what she relied on in doing so. Dr. Frazier acknowledged that, medically speaking, there was no way to determine—from a physical examination alone—whether a person had engaged in sexual intercourse. Dr. Frazier also acknowledged that the medical history she relied upon, as presented by Victim, was not supported by the medical records Dr. Frazier reviewed. In short, Johnson established that Dr. Frazier's diagnosis was based solely on the accusations made by Victim. And he used this fact to argue that Dr. Frazier was not credible:

> Even Children's Mercy said they didn't do any tests for UTI's, they didn't look at any prior medical record, all they did was listen to her lies, write them down, do a visual examination, and go, okay, we're good.
>
> It was a normal examination, her hymen was intact, no rips, no, no scars, no tears, no damage of any kind. The doctor wants you to say, well, don't, don't pay attention to that, that's, that doesn't mean anything.
>
> Come on. All they're worried about is if they say something happened, if the patient says it happened, then we're off to the races, whatever they find, whether there, where there's, whether there's tears, or no tears, normal exam, they're always going to say, oh, well, yeah, that, that means she must be telling the truth.

"No . . . trial [or] judgment . . . [shall be] in any manner affected: . . . [f]or any error committed at the instance or in favor of the defendant." § 545.030.1(16). "'It is axiomatic that a defendant may not take advantage of self-invited error or error of his own making.'" *State v. Bolden*, 371 S.W.3d 802, 806 (Mo. banc 2012) (quoting *State v. Mayes*, 63 S.W.3d 615, 632 n.6 (Mo. banc 2001)).

Here, Johnson portrayed Dr. Frazier's testimony as incredible precisely *because* she accepted Victim's allegations as true in conducting her examination. Johnson cannot now

8

complain that his chosen method of impeachment constituted an improper bolstering of the State's case.

In sum, Dr. Frazier's stricken testimony was neither improper nor prejudicial. The testimony about which Johnson complains was stricken in accordance with his request. To the extent that any prejudice whatsoever can be discerned from the stricken testimony, it is only because of the defense's chosen strategy.

Point I is denied.

**B. The trial court did not abuse its discretion in admitting testimony that Victim said she was raped.**

In his second point, Johnson argues that the trial court abused its discretion in admitting hearsay testimony from Durham (the mother of Victim's best friend) that Victim indicated she had been raped by her stepfather.

"The trial court has broad discretion in determining whether to admit or exclude evidence." *State v. Joyner*, 458 S.W.3d 875, 880 (Mo. App. W.D. 2015). "Thus, we review the trial court's decisions regarding the admission of evidence for an abuse of discretion." *Id*. "The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id*. "An abuse of discretion in admitting evidence[, however,] does not [mandate] reversal of a conviction unless prejudice is demonstrated, established by proof that admission of the evidence was outcome determinative." *Id*. "'A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a

9

different conclusion but for the erroneously admitted evidence.'" *Id*. (quoting *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000) (internal quotations omitted)).

At trial, the State asked Durham, "When you contacted [Victim's] dad that night, why did you contact him?" Before Durham could answer, defense counsel objected, arguing that the question called for hearsay. The court overruled the objection on the ground that it was offered to prove why Durham did what she did. Then, the following exchange occurred:

Q. Why did you contact [Victim's father]?

A. Because [Victim] asked me to.

Q. Had [Victim] said, told you something that caused you to contact him?

A. Yes.

Q. Okay. And what was it that she told you?

[Defense counsel]: Objection, hearsay, Judge.

The Court: Overruled. Is this offered to show what this witness did?

[Prosecutor]: Yes, Judge, it shows why she contacted [Victim's father].

The Court: All right. Overruled.

Q. You can answer the question.

A. Can you repeat it, please?

Q. Sure. The question was, what did [Victim] tell you that caused you to contact [Victim's father]?

A. She told me that her stepdad, Bryan, raped her.

Defense counsel again raised a hearsay objection, which was again overruled. The testimony continued:

Q. What was [Victim's] demeanor when she disclosed this to you?

10

A. When she actually disclosed it, she wrote it on a piece of paper. Leading up to that, she was very shaky. At one point, we sat on the loveseat and she just cried. She tried to talk several times before she actually said anything, appeared to be distraught. She finally just asked me for a piece of paper.

Q. And she wrote it down?

A. And that's when she wrote the, wrote the word, rape.

Johnson argues that the court abused its discretion in admitting Durham's testimony that Victim said she had been raped by her stepfather because this testimony constituted hearsay and did not fall within any recognized exceptions.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted." *State v. McFadden*, 391 S.W.3d 408, 431 (Mo. banc 2013). "Not all out-of-court statements are hearsay[, however,] in that[,] to constitute hearsay[,] the statement must be offered for the truth of the matter asserted." *State v. Lockett*, 165 S.W.3d 199, 204 (Mo. App. E.D. 2005). Accordingly, "[i]f an out-of-court statement is not offered to prove the truth of the matter asserted but instead is offered to prove relevant background, then the statement is not inadmissible hearsay." *State v. Davenport*, 924 S.W.2d 6, 10 (Mo. App. E.D. 1996). "Statements made by an out-of-court declarant that explain subsequent conduct are admissible as supplying relevant background and continuity." *Id*.

The trial court found that Durham's testimony regarding Victim's statements was not hearsay because it was offered not for the truth of the matter asserted, but to explain why Durham called Victim's father. Johnson argues that the testimony was not admissible for this purpose because it went beyond what was necessary to explain Durham's subsequent conduct. Johnson claims that the State needed to go no further than when it elicited Durham's response that she called Victim's father "[b]ecause [Victim] asked [her] to." Accordingly, Johnson argues

11

that testimony that Victim said she had been raped by her stepfather was unnecessary to explain subsequent conduct and, therefore, inadmissible.

In *State v. Garrett*, 139 S.W.3d 577, 582 (Mo. App. S.D. 2004), the Southern District noted that the "subsequent conduct" rationale "is susceptible to abuse"; this occurs when the testimony goes "beyond the scope necessary to show subsequent conduct." *State v. Robinson*, 111 S.W.3d 510, 515 (Mo. App. S.D. 2003). But simply showing that testimony exceeded the scope of the subsequent conduct rationale does not mandate reversal; the admission of such evidence must result in outcome-determinative prejudice to the defendant before reversal is warranted. *Garrett*, 139 S.W.3d at 582-83.

"The reason hearsay is generally inadmissible is because the person who made the offered statement is not under oath or subject to cross-examination." *State v. Jackson*, 426 S.W.3d 717, 719 (Mo. App. E.D. 2014). "Accordingly, prejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination . . . ." *Id*.

Here, even accepting Johnson's argument that Durham's testimony exceeded the scope of the subsequent conduct rationale, he has failed to demonstrate any prejudice. Victim (the out-of-court declarant) testified at trial, to the exact same facts as Durham, and was available for cross-examination. During her testimony, Victim explained going to Durham's house, crying on the couch, and writing the word, "rape," on a piece of paper:

Q. Did you, tell me about actually telling them what you wanted to tell them?

A. We sat on the couch, and I sat there and I cried for a long time. And I was trying to get words to come out of my mouth and they, they couldn't come, and they couldn't come, and I finally asked for a piece of paper and a pen, and they gave me a little scratch of paper and a pen, and I remember just sitting there with the pen touching the paper and thinking it's got to move, it's got to move,

12

> like, why can't, why can't I get this written down. And then finally I wrote the word, rape.

Johnson was fully able to cross-examine victim, and did so, regarding her claim that he raped her. Thus, there is no discernable prejudice from the admission of Durham's testimony.[6]

Point II is denied.

## C. Johnson was not prejudiced by the State's improper cross-examination of his character witnesses.

In his third point on appeal, Johnson argues that the court plainly erred in failing to sua sponte declare a mistrial or strike testimony elicited during the cross-examination of Johnson's character witnesses, Stephanie Hartzler and Jack Arnett, because the testimony was the result of improper cross-examination.

Johnson acknowledges that he "fail[ed] to object to most of the testimony at issue, and . . . fail[ed] to raise the issue in the motion for new trial." Accordingly, he requests plain error review.

"Trial judges are not expected to assist counsel in trying cases and should act sua sponte only in exceptional circumstances." *State v. Francis*, 60 S.W.3d 662, 671 (Mo. App. W.D. 2001) (internal quotations omitted). "A trial court will not be faulted for failing to take corrective action, when that action is not requested." *Id*. "Pursuant to Rule 30.20, we have discretion to review for 'plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.'" *State v. White*, 222 S.W.3d

---

[6] Johnson argues that the testimony was prejudicial insofar as it was duplicative of Victim's testimony at trial. He relies on *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987). *Seever* is readily distinguishable from Johnson's case and does not aid his claim. *Seever* involved a situation where the victim testified from the stand and the prosecution introduced entirely duplicative out-of-court statements of the victim for no other reason than to bolster the victim's testimony. *Id*. "[I]n the *Seever* case, what concerned the court was a total duplication of testimony from the victim." *State v. Ford*, 753 S.W.2d 5, 7 (Mo. App. W.D. 1988). Thus, *Seever* is inapplicable if "the testimony was not entirely duplicative." *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). Here, Durham testified to one detail that overlapped with Victim's testimony. This can hardly be characterized as "entirely duplicative."

13

297, 300 (Mo. App. W.D. 2007) (quoting Rule 30.20). "The review involves two steps." *Id*. "'First, we must decide whether the claim facially establishes an error that is evident, obvious, clear and affected substantial rights.'" *Id*. (quoting *State v. Angle*, 146 S.W.3d 4, 13 (Mo. App. W.D. 2004)). "If we find plain error, we can proceed to the second step and consider whether manifest injustice will result if the error is left uncorrected." *Id*.

At trial, Johnson called witnesses Hartzler and Arnett to testify to Johnson's good character. He now complains that the prosecutor's cross-examination of these character witnesses was improper and that the court should have acted sua sponte to either strike the testimony or declare a mistrial. In light of the record before us, we believe a brief overview regarding the proper presentation of evidence from, and cross-examination of, character witnesses is in order.

A witness is qualified to testify as to the accused's reputation for truthfulness and veracity if it is shown that the witness is sufficiently familiar with "the [accused], the community in which he has lived[,] or the circles in which he has moved[, so] as to speak with authority of his character." *State v. Huffman*, 607 S.W.2d 702, 704 (Mo. App. E.D. 1980). "It is not what the witness knows about the general conduct of the person about whom he testifies, but rather he should know the general reputation of this person in the neighborhood or among people with whom the witness associates for the character trait in question." *Id*. "**A personal view of the witness as to the character of the accused is immaterial and not admissible**." *Id*. (emphasis added).

Here, defense counsel repeatedly tried to elicit the witnesses' personal views of Johnson's character. For example, when questioning Hartzler, defense counsel asked: "In working with Bryan over the years in a variety of settings in the community, *have you been able*

14

*to form an opinion* as to Bryan's general character in the community?"; "*Have you had an opportunity to form an opinion* as to Bryan's character in the community?"; and "In your dealings with Bryan over the years, *have you had an opportunity to form an opinion* as to his reputation for truthfulness and honesty within the community?" (Emphasis added.) All of these questions were directed at Hartzler's personal opinion of Johnson's reputation, and not her understanding of Johnson's reputation in the community, generally. "A personal view of the witness as to the character of the accused is immaterial and not admissible." *Huffman*, 607 S.W.2d at 704.

Likewise, when questioning Arnett, defense counsel asked: "Given your interaction with him in the community and the time that you've known him, *have you had an opportunity to form an opinion* as to his general character in the community?" (Emphasis added.) Arnett responded with his own personal opinion: "*My opinion would be* that Bryan always displayed a high level of integrity in the community, honesty, and his willingness to volunteer and work with the young kids in the community and the adults that we had to deal with, so I would say absolutely a high level." (Emphasis added.) Again, "[a] personal view of the witness as to the character of the accused is immaterial and not admissible." *Huffman*, 607 S.W.2d at 704.

In short, Johnson improperly presented irrelevant and immaterial evidence from his character witnesses as to their own personal opinions of Johnson's character. We now turn to cross-examination.

"The general rule in Missouri . . . is that the State may cross-examine a character witness with reference to defendant's prior arrests and accusations of specific misconduct for the purpose of testing the trustworthiness, knowledge and good faith of the witness." *State v. Siems*, 535 S.W.2d 261, 264 (Mo. App. 1976). "Such cross-examination . . . tests the witness's familiarity

15

with the reputation of the defendant and the stringency of the standard on which that reputation was earned." *State v. Creason*, 847 S.W.2d 482, 486 (Mo. App. W.D. 1993). "'[P]rosecuting officials should not be permitted in this fashion[, however,] to convey to the jury by innuendo and insinuation purported information which they are forbidden to impart directly.'" *Siems*, 535 S.W.2d at 265 (quoting *State v. Selle*, 367 S.W.2d 522, 530 (Mo. 1963)).

Accordingly, "the form of the questions about other acts of misconduct is important." *Id*. at 264. "Couching the question in terms of personal knowledge has been criticized and prohibited." *Creason*, 847 S.W.2d at 487. "'Were you aware' and 'did you know' requests personal knowledge of the witness and implies the matter inquired of as a fact . . . ." *Id*. at 488. "The preferred method of asking the question is, 'have you heard . . . .' The inquiry must be directed to rumors or reports concerning the defendant's character, and not be of the 'don't you know' type." *Id*. (internal citation omitted). In short, "cross-examination of a character witness may include inquiries in good faith as to whether he has heard rumors or reports of specific acts of misconduct (not remote or ancient) which would reflect upon defendant's character." *Selle*, 367 S.W.2d at 529. But "it is improper to propound hypothetical questions which assume supposed facts and call for an opinion predicated thereupon." *Id*. at 530.

During cross-examination of Hartzler, the State asked the following questions for the purpose of impeaching Hartzler's testimony:

> Q. Ma'am, you testified to your opinion of the defendant; would it change your opinion **if you knew** that he would touch his stepdaughter's vagina with his hand?
>
> A. If I knew that to be a fact, it would.
>
> Q. Would it change your opinion **if you knew** that he would touch his daughter's vagina with his penis?
>
> A. If I knew that for a fact, it would.

16

Q. And I'm going to ask you to answer yes or no, would it change your opinion, yes or no?

A. Can you reword the question, restate the question, please?

Q. Would it change your opinion of him **if you were aware** that he had touched his daughter with his penis on the vagina?

A. Yes, if it was a fact.

Q. Ma'am, yes or no?

A. Yes.

Q. Would it change your opinion of him **if you knew** that he had put his fingers in his daughter's vagina, his stepdaughter's vagina?

A. Yes.

Q. And would it change your opinion of him **if you knew** that he had sexual intercourse with his stepdaughter, who was under the age of 12 years old?

A. Yes, it would change my opinion.

Q. Would it change your opinion **if you knew** that the defendant had anal intercourse with her, in which he put his penis inside her anus?

A. Yes.

Q. Would it change your opinion **if you knew** that the defendant had a relationship with a married woman, had a sexual relationship with a married woman?

A. With his wife?

Q. No.

A. With another—yes.

Q. And would that change your, would it change your opinion of the defendant **if you knew** that he produced a child with her while she was married to someone else?

A. Yes.

(Emphasis added.)

Similarly, when cross-examining Arnett, the State focused its questions on the underlying allegations of the charged conduct:

Q. Let's talk a little bit about your opinion of the defendant.

A. Okay.

Q. Would your opinion of the defendant change **if you found out** that he was playing a video of a victim disclosing sexual acts and acts of sexual abuse against her, as child, to other members in the community?

A. Would my opinion change?

Q. Would your opinion of his integrity, as you testified, change?

A. I base my opinion on facts that I know. I'm not quite sure, I mean, you're asking me—

Q. Well, you said he was a man of integrity.

A. Yes, sir, I believe that.

Q. So, I'm asking you if your opinion as to his integrity would change **if you found out** if he was showing a video—

A. I suppose I would, just like any other person, would re-evaluate, depending on the circumstances, yes, sir.

Q. That would change your opinion?

A. I, I would look at in the entirety and I make a judgment.

Q. Would it also change your opinion as to his integrity **if you found out** that he was inserting—

[At this point, defense counsel objected to specific instances of misconduct, and the objection was overruled.]

Q. Would your opinion of the defendant change **if you found out** that he had committed acts of sexual abuse against his less than 12 year old stepdaughter?

A. I think under those circumstances, absolutely.

(Emphasis added.)

Here, Johnson argues that the prosecutor's cross-examinations of Hartzler and Arnett were improper insofar as "[t]he questions were argumentative and, based upon the form of the question, implied that the state had personal knowledge of the acts in question." We agree with Johnson that the State's questions were not in the generally acceptable form insofar as they assumed the facts stated within them.[7] But, that being said, we do not see how Johnson was prejudiced by the form of the questions.

When cross-examining a defendant's character witnesses, the State's questions "must have a good faith or reasonable basis." *Creason*, 827 S.W.2d at 486. While "[t]he court should not presume that the prosecutor has acted in bad faith, without some evidence of bad faith conduct[,] . . . [w]hen that good faith presumption is challenged and there is nothing in the record to support the question, the court can no longer indulge the presumption." *Id*. at 487.

Here, the facts assumed in the prosecutor's questions were: (1) Johnson's improper sexual conduct underlying the charges and Victim's allegations; (2) Johnson's extramarital affair and illegitimate child born therefrom; and (3) Johnson's act of showing Victim's videotaped interview, where she disclosed the abuse, to other people. There is a good faith basis in the record for all of these assumed facts; thus, Johnson cannot demonstrate prejudice. First, "[a] criminal charge, which carries with it certain safeguards of good cause that the crime occurred, supplies a reasonable basis for the questions asked of the witness." *Id*. Thus, questions pertaining to the underlying charges had a good faith basis. Additionally, there was obviously a

---

[7] It is not entirely clear whether the State's questions were improper, however. As discussed above, the evidence Johnson elicited on direct examination was irrelevant and inadmissible insofar as it involved the character witnesses' own personal opinions of Johnson's character. The State's questions appear to directly address the evidence as presented in direct examination and, therefore, may have been admissible under the doctrine of curative admissibility. "The curative admissibility doctrine applies when one party introduces inadmissible evidence and allows the opposing party to introduce otherwise inadmissible evidence to rebut or explain inferences raised by the first party's evidence." *State v. Taylor*, 298 S.W.3d 482, 493 (Mo. banc 2009). But we need not decide this issue in light of our holding that Johnson has failed to demonstrate any prejudice from the State's questioning.

basis in the evidence from Victim's testimony for the other allegations of sexual misconduct. As for the questions regarding the extramarital affair and child born therefrom, Johnson's witness, Desiree Shaw, testified that she and Johnson had a sexual relationship while she was married to another man. Additionally, Shaw and Johnson had a son who was born in 1992, and Johnson and Shaw were not married at that time. Finally, Johnson himself admitted showing Victim's videotaped interview to others; thus, there was a good faith basis for that question as well.

Because there was a good faith basis for all of the State's questions on cross-examination of Johnson's character witnesses, he cannot demonstrate prejudice from the form of the State's questions.

Point III is denied.

### D. The trial court did not abuse its discretion in overruling Johnson's motion for new trial.

In his final point on appeal, Johnson argues that the trial court abused its discretion in overruling his motion for new trial based on juror misconduct.

"We review the trial court's denial of a motion for new trial for abuse of discretion." *State v. Rios*, 314 S.W.3d 414, 418 (Mo. App. W.D. 2010). "'The trial court abuses its discretion when its ruling is clearly against the logic of the existing circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Id.* (quoting *State v. Stephens*, 88 S.W.3d 876, 881 (Mo. App. W.D. 2002)). "The findings of the trial court when ruling on a motion for new trial on the grounds of juror misconduct are given great weight and will not be disturbed on appeal unless the trial court abused its discretion." *Id.*

"A party alleging juror misconduct during voir dire must present evidence to substantiate its allegations." *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 639 (Mo. banc 2013). "The movant bears the burden of proving any allegations made in a motion for new

20

trial." *Id*. "When making factual determinations a circuit court is free to disbelieve any, all, or none of the evidence." *Id*. "'Appellate courts defer to the trial court on factual issues because it is in a better position . . . to judge [not only] the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.'" *Id*. at 639-40 (quoting *White v. Dir. of Revenue*, 321 S.W.3d 298, 308-09 (Mo. banc 2010)) (internal quotations omitted).

After hearing multiple times from Juror herself and listening to Johnson's evidence supporting his claim of intentional nondisclosure, the court made very detailed findings on the record:

> First, defense counsel has used, and this is not meant as a criticism, this is an observation of the court and a finding of the court; the defense counsel [has used] the word, familiarity, quote, end quote, familiarity, that a juror may've had with a witness or the defendant.

> The record should reflect that on the record made with the juror, and others, that the word, familiarity, was never used, nor adopted by the juror.

> I understand it's argument.

> At best, there has been a statement, not recalled by the juror, that at some point she may have recognized a witness as a result of a high school experience some years ago.

> It was brought out at the trial that the witness referred to in the motion, and the juror, did attend the same high school, but they were three to four years apart, and that freshmen of that particular high school didn't even attend the actual high school itself, but may've been in the years of high school at the same time, and that it was not common for seniors and freshmen to socialize a lot together.

> There have been suggestions that the witness and the juror may've participated in similar extracurricular activities, such as dance team and cheer team. There's no evidence that there was any connection between the juror and a witness, for which the defendant now complains.

Taking all of the defense's evidence of today, the best that could be drawn is that a juror may have made a statement to another that she may have recognized a witness at some point. It was not a statement of the juror.

The juror was questioned extensively, in camera, with the presence of all counsel, and with an affirmative defense by counsel (sic) of the right to confrontation, because in chambers conferences are part of the record, and there was an affirmative waiver of confrontation by defense counsel, because that was done on the occasion and the request of the defense.

The juror was questioned extensively by the court as to whether or not certain statements may've been made, but, more importantly, whether or not there was any relationship of any kind, friendship, acquaintanceship, familiarity, to borrow the defense's word, with the witness referred to in the pleadings.

The juror maintained that there was no such relationship of any kind. Did acknowledge that they went to the same high school, but at different times.

It should be noted, and it's part of the record, that the same inquiry was made at the end of the trial, and the juror's answers have been consistent all of the way through.

The court has had the ability to observe the demeanor and conduct and testimony of the juror, and the two other defense witnesses called today. ***This court makes an affirmative finding that the testimony of the juror is entirely believable, consistent with her answers all of the way through***.

Her facial expressions were sincere and serious, she looked the court straight in the eye, and we were sitting at a jury table, I was approximately three or four feet from the witness. She displayed no outward or overt things that lawyers and judges look to in an attempt to determine whether or not somebody is being entirely candid.

The court assured her that all I wanted was candor and honesty. And she was under oath, in addition.

In short, there is absolute nothing to indicate that this juror has engaged in any misconduct. And there is no evidence to suggest that she was anything but a fair and impartial juror, and listened to the case and decided the case with her fellow jurors in accord with the court's instructions.

There is no evidence of any prejudice. Even if the juror had acknowledged that she had a friendship with the person, the ultimate question is the ability to be fair and impartial. And I'm satisfied that this juror satisfied those constitutional requirements.

With regard to an argument that was added today that the defense would've exercised a peremptory challenge with regard to this juror if they had known of this, that argument is rejected by the court as speculative in nature, and was also not raised at anytime, except in oral argument today.

It's not part of the motion. Even if it were, the court would not find that persuasive. Defendant's motion for judgment of acquittal notwithstanding the verdict of the jury or, in the alternative, for a new trial denied.

(Emphasis added.)

As is readily apparent from the emphasized portion of the trial court's findings above, the court found Juror credible when she stated that she did not have any relationship with any of the parties. That is an express credibility determination to which we will defer. Johnson argues that where juror misconduct is established in a felony trial, the state bears the burden of demonstrating that the defendant was not prejudiced by the misconduct, and, that here, the state failed to carry its burden. But, as juror misconduct was not established in this case, Johnson's focus on prejudice is misplaced.

Point IV is denied.

## Conclusion

Johnson has failed to demonstrate reversible error in either the admission of testimony or the overruling of his motion for new trial. The trial court's judgment is affirmed.

Karen King Mitchell, Judge

Joseph M. Ellis, Presiding Judge,
and Gary D. Witt, Judge, concur.

23